Carskaddon *v.* Mills *et al.*

---

No. 624.

### CARSKADDON *v.* MILLS ET AL.

LICENSE.—*Use of Lot as Roadway.*—*Revocation of License.*—*Dangerous Obstruction.*—*Warning to Public.*—Where the public had been permitted to drive over a certain piece of ground for a number of years without objection it amounted to a license for them to do so, and the owner of the ground would not have the right to enclose it, so as to make it dangerous to those likely to pass over it without giving some sort of warning.

SAME.—*Revocation of.*—*Burden of Proof.*—While a mere license to travel over the land of another may be revoked at any time, at the pleasure of the licensor, yet where the license is once proved, or a *prima facie* case of such license has been made out, it then devolves upon the party asserting a revocation to prove it by a preponderance of the evidence.

From the St. Joseph Circuit Court.

*W. A. Funk,* for appellant.

*A. L. Brick* and *J. A. Judie,* for appellees.

REINHARD, C. J.—Action by the appellant against the appellees for damages for an injury to appellant's horse. There was a trial by the court.

After the evidence for plaintiff was closed the court announced that there would be no necessity of hearing any evidence on the part of the defendants as that for the plaintiff was insufficient to entitle him to a recovery. The court thereupon found for the defendants. The only questions presented here arise upon the sufficiency of the evidence to

sustain the finding. The facts disclosed by the evidence are as follows:

Anna Mills is the owner of a lot in the city of South Bend. Meredith Mills, her husband, as her agent, purchased said property for her, and has managed the same ever since. Across this lot ran a road, leading from one street to another in said city and it was used by the traveling public generally for said purpose, and had been so used for a period of from five to fifteen years. The road was a well-defined track made by wagons, buggies, horses, etc. Anna Mills purchased the lot in October, 1890, from one Lucius Hubbard, who had owned it since 1875 and had had an undivided interest in the land out of which it was carved, since 1871. Hubbard lived at some distance from the lot and never saw it but twice during the time he owned it,—the first time about 8 or 10 years and the last time some 5 years previous to the day of the trial. The first time he did not notice the road, but he did see it the last time and made no objection to the use of the lot as a road, except to himself. He "thought" he would fence it in, but did not do so on account of the expense connected with it.

He never consented that any one might use the road, having never been asked for permission to do so. When Mills purchased the property for his wife he knew the road was there. The lot was not fenced on the front and rear, the direction in which the road ran, but was fenced on the sides. After the purchase, appellees at once took possession of and began building a dwelling-house upon it, during the building of which the public continued to use the road. When the house was finished, and the appellees moved into it, they informed the people travelling over this roadway not to use it any longer for that purpose, but no heed was paid to this, when, in the latter part of December, 1890, in order the more effectually to stop the travel over the lot, the appellees stretched a strand of barbed wire across the rear end of the lot, about three feet above the ground and at right

angles, or nearly so, with said road. The entire fence was upon the appellee's lot. No notice of any kind was given of this obstruction otherwise than as it advertised itself. The wire could not be seen in the dark of night and only a short distance—twenty to twenty-five feet—in day light. There were no posts that could be seen from the road in the night when the accident hereinafter alluded to occurred. The appellant, who lived in that community, had frequently travelled over the road leading across this lot, and had no notice or knowledge of its being closed up with the wire. The last time before the accident when he passed over the lot was in September or October, 1890. At about 6 o'clock on the evening of January 1, 1891, after it had become too dark to see this wire, the appellant attempted to drive across this lot, in the road, to perform some legitimate errand on the other side. Not knowing of the presence of the wire, he drove his horse briskly ahead of him until the animal come up suddenly against the barbs, cutting a gash in its front leg four to five inches in length and two inches deep, severing the frontal muscle, from which the horse was injured, to the damage of the appellant.

When the appellant had closed his evidence, the learned judge observed that he had examined the law of the case, and saw no reason why a man could not fence in his own land, on his own ground, and that " a travelling man over such property, taking the license into his own hand, without invitation or inducement, because others do so, suffers injury, he must put up with it."

The appellant insists that in this view of the law the court below was in error, and should have sustained his motion for a new trial. The only question it becomes our duty to determine is whether the facts proved by the appellant made a prima facie right to recover.

The first important inquiry that arises is as to the status occupied by the appellant in relation to the appellee's ground at the time the former attempted to cross it on the night of

January 1. Was he a trespasser or a licensee, for we think it clearly appears from the evidence that he sustained one or the other of these positions to the property. We think that the right the appellant had, if any, to the use of the appellee's property was the same as that which the public had. The latter had used this ground, as we have seen, without objection, for a number of years. This did not amount to a dedication or give the public an easement, but it did amount to a license. A license may be created either by parol or by acquiescence in the use of the property for the purpose in question without objection. We take it, therefore, that when the appellant had proved that the public had been permitted to use this lot as a roadway he had made a *prima facie* case of a license.

A mere license, however, to travel over the land of another may be revoked at any time at the pleasure of the licensor. *Parish* v. *Kaspare*, 109 Ind. 586; *Simpson* v. *Wright*, 21 Ill. App. 67; 13 Am. and Eng. Encyc. of Law 555.

Where the license is once proved, however, or a *prima facie* case of such license has been made out, it then devolves upon the party asserting a revocation to prove it. *Blunt* v. *Barrett*, 54 N. Y. Sup. 548.

Consequently if the license in the present case was claimed to have been discontinued or revoked, the burden was upon appellees to show that fact.

Was such revocation established, or was there any evidence from which the court could infer the same?

The transfer of the property, or the fencing of the same, may, under ordinary circumstances, be sufficient to amount to a revocation. Ordinarily, a man has a right to use his own property as he pleases, but at the same time this gives him no right to use it to the detriment or injury of his neighbor. We think the erection of an ordinary fence around the lot, one that was not calculated to inflict injury, was proper and right, and it was the privilege of the appellees to thus close up their premises without asking of any one the per-

mission to do so. But whenever they undertook to enclose their property under circumstances that made it dangerous to those likely to pass over it, and which the appellees must anticipate would incur injury by it, it became their duty, if such dangerous means must be employed to accomplish the purpose, to give some sort of warning.

Thus it was held in *Houston, etc., R. W. Co.* v. *Boozer,* 70 Tex. 530, that if the owner of the land has been accustomed to permit others to use his property to travel over to such an extent as to produce a confident belief that the use will not be objected to, he must not mislead them by failing to give a proper warning of his intention to recall the permission. See, also, *Cornish* v. *Stubbs,* 5 L. R. C. P. 334; *Mellor* v. *Watkins,* L. R., 9 Q. B. 400.

While we grant the clear right of the appellees to revoke the license, we assert as emphatically that they must do so in a manner not calculated under ordinary circumstances to inflict injury unnecessarily. Although a licensee acquires no interest, as the term is usually employed, nor property right in the real estate over which he is allowed to travel, he yet has the right not to be wilfully or even recklessly injured by the acts of the owner. It can not be said truthfully that the owner does not owe *some* duty to a licensee.

At the time of the stretching of the wire, the appellees must have known that the public would continue to travel over this lot until in some way prevented from doing so. They must have known further that a single strand of wire, without posts at the roadside, or other means calculated to attract the attention of passersby, could not be seen in the dark, and was a dangerous obstruction, liable to injure those coming in contact with it. They must, therefore, have anticipated just such results as the one that happened to the appellant. It was their clear duty, consequently, in case they desired to make use of the dangerous wire, to shut out the public from going over their lot, to give some warning by which the presence of the wire might be detected. Had

they used an ordinary fence, one constructed out of material not necessarily dangerous to life and limb even if encountered in the dark, the case might be otherwise and notice might not have been necessary. But the stretching of the barbed wire, without notice, under the circumstances was, we think, a plain violation of duty.

The case made by the evidence is one of more than mere passive negligence. In that class of cases it is well enough settled that there is no liability to a mere licensee. Thus where the owner of premises inadvertently leaves unguarded a pit, hatchway, trap-door, cistern, or other dangerous opening, and one who is present merely by permission and not by invitation, express or implied, falls into the opening and is injured, he can not recover, as, in such case, he enjoys the license subject to the risks. *Thiele* v. *McManus*, 3 Ind. App. 132. But while an owner may not be liable to one who is thus injured by mere inattention and neglect of the owner, there could be no doubt of his liability if it were shown that the obstruction was placed there purposely to keep the licensee from entering the premises, or for the very purpose of inflicting injury if an attempt be made to cross. As well might an owner give permission to his neighbor to travel over his field and then set a trap to hurt him.

Where the owner of ground digs a pit or erects other dangerous obstructions at a place where it is probable that persons or animals may go and become injured, without using proper care to guard the same, it is well settled in this State that there is a liability, and that the owner must respond in damages for any injury incurred by such negligence. *Young* v. *Harvey*, 16 Ind. 314; *Graves* v. *Thomas*, 95 Ind. 361; *Mayhew* v. *Burns*, 103 Ind. 328; *Penso* v. *McCormick*, 125 Ind. 116.

A barbed wire fence is not of itself an unlawful one, and the building of such along a public highway is not necessarily a negligent act; but yet, even in such case as that, there may be circumstances under which a person building

such a fence, in a negligent manner, will be held liable for damages caused thereby. *Sisk* v. *Crump*, 112 Ind. 504. All these cases proceed upon the assumption that the party whose negligence caused the injury owed the other some duty which he failed to perform, for, after all, negligence is nothing more nor less than the failure to discharge some legal duty or obligation.

Even trespassers have some rights an owner is bound to respect. If a person, without permission, should attempt to cross the field of another, and tramp down his growing grain, it would not be contended, we apprehend, that this gave the owner any right to kill the trespasser, or even to seriously injure him unnecessarily. The use of spring guns, traps, and other devices to catch and injure trespassing persons or animals has been condemned both in this country and in England. *Hooker* v. *Miller*, 37 Iowa, 613; *Deane* v. *Clayton*, 7 Taunt. 489. If such means may not be employed against trespassers, we do not see upon what principle it can be held that it is proper to use them against one who has a permissive right to go upon the property where they are placed.

While in the case at bar there may be no proof of intentional injury, the facts, we think, bring the case within the principle declared in *Young* v. *Harvey*, *supra*, *Graves* v. *Thomas*, *supra*, *Penso* v. *McCormick*, *supra*, and *Sisk* v. *Crump*, *supra*.

The court should have sustained the motion for a new trial.

Judgment reversed.

Filed June 8, 1892.